AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Columbia

In the Matter of the Search of

*(Briefly describe the property to be searched*
*or identify the person by name and address)*

IN THE MATTER OF THE SEARCH OF INFORMATION
ASSOCIATED WITH ONE ACCOUNT(S) STORED AT
PREMISES CONTROLLED BY GOOGLE LLC PURSUANT TO
18 U.S.C. 2703 FOR INVESTIGATION OF VIOLATION OF
1752(a)(1) and (2); and 18 U.S.C. § 1512(c)(2)

)
)
)
)
)
)
)

Case No. 21-SC-996

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, hereby incorporated by reference

located in the _____Northern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

❒ contraband, fruits of crime, or other items illegally possessed;

❒ property designed for use, intended for use, or used in committing a crime;

❒ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1512(c)(2), 111, 231 371,372, 1361, 2101, 1752(a)(1) and (2) 40 U.S.C. § 5104(e)(2) | Obstruction of an Official Proceeding; Assaulting a Federal Agent, Civil Disorders, Conspiracy, Conspiracy to impede or injure officer, destruction of government property, interstate travel to participate in riot, unlawful entry, violet entry on capitol grounds |

The application is based on these facts:

SEE AFFIDAVIT

❒ Continued on the attached sheet.

❒ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Derek Corral, FBI Special Agent

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____TELEPHONE_____ *(specify reliable electronic means).*

Date: _____03/24/2021_____

*Judge's signature*

City and state: _____Washington, D.C._____

Zia M. Faruqi, U.S. Magistrate Judge

*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means

☐ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

District of Columbia

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

IN THE MATTER OF THE SEARCH OF INFORMATION
ASSOCIATED WITH ONE ACCOUNT(S) STORED AT PREMISES
CONTROLLED BY GOOGLE LLC PURSUANT TO 18 U.S.C. 2703
FOR INVESTIGATION OF VIOLATION OF 1752(a)(1) and (2);
and  18 U.S.C. § 1512(c)(2)

)
)
)
)  Case No.  21-SC-996
)
)
)

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Northern_____ District of _____California_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A, hereby incorporated by reference

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference

**YOU ARE COMMANDED** to execute this warrant on or before _____April 7, 2021_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to       Zia M. Faruqui, U.S. Magistrate Judge
                                                                                                                    *(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C.
§ 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   03/24/2021

City and state:   Washington, D.C.

_____
*Judge's signature*

Zia M. Faruqui, U.S.Magistrate Judge
*Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>  21-SC-996 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| Certification |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**<u>ATTACHMENT A</u>**
**Property to Be Searched**

This warrant applies to information which is associated with the GOOGLE account identified by the e-mail address erkfdzdrums@gmail, which is stored at premises owned, maintained, controlled, or operated by Google LLC, , a company that accepts service of legal process at 1600 Amphitheatre Parkway, Mountain View, California.

## ATTACHMENT B

### Particular Things to be Seized

**I.     Information to be disclosed by Google LLC (the "Provider") to facilitate execution of the warrant**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.   All records or other information regarding the identification of the Account(s), to include full name, physical address, telephone numbers, username and other identifiers, primary e-mail address, any secondary or alternative e-mail addresses (including both current and historical accounts), records of session times and durations, Activity and Device Logs, the date on which the Account(s) was created, the length of service, the IP address used to register the Account, log-in IP addresses associated with session times and dates, account status, cookies, connected applications and sites, methods of connecting, log files, and means and source of payment (including any credit or bank account number), and other subscriber numbers or identities (including the registration IP address), including any current or past account(s) linked to the Account by telephone number, recovery or alternate e-mail address, IP address, cookie, or other unique device or user identifier;

b.   All records or other information regarding the devices associated with, or used in connection with, the Account(s), (including all current and past trusted or authorized Android devices and computers, and any devices used to access Google services associated with the Account(s)), including serial numbers, Unique Device Identifiers ("UDID"), Advertising Identifiers ("IDFA"), Global Unique Identifiers ("GUID"), Media Access Control ("MAC") addresses, Integrated Circuit Card ID numbers ("ICCID"), Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identities ("IMSI"), and International Mobile Station Equipment Identities ("IMEI") or other device identifier, operating system information, browser information, mobile network information, information regarding cookies and similar technologies, and any other unique identifiers that would assist in identifying any such device(s);

c.   Passwords or other protective devices in place and associated with the Accounts, which would permit access to the content stored therein;

**d.** The types of applications and services utilized by the Account(s);

**e.** All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to PROVIDER;

**f.** For the period from November 1, 2020 to February 1, 2021, all contacts stored by the Account(s), including address books, phone numbers, e-mails, social network links, calendar data, and images;

**g.** For the period of December 15, 2020 to January 15, 2021 all location data whether derived from Global Positioning System (GPS) data, cell site/cell tower triangulation/trilateration, precision measurement information such as timing advance or per call measurement data, Wi-Fi locations, IP addresses, search history, advertising data, or metadata of images and videos, including all data associated with the use of Location Services and Location History, and all Google Maps data (including data concerning route searches, saved, starred, and/or favorite locations, frequent locations, and other data associated with the use of My Maps and Location Sharing, and the logs and metadata associated with all of the above), and SSIDs and MAC addresses for all WiFi access points that have been detected by or connected to devices associated with the account. Such data shall include the GPS coordinates and the dates and times of all location recordings;

**h.** For the time period December 15, 2020 to Present, all records concerning the deletion of location data associated with the Account (except for data deleted by PROVIDER in the normal course of business);

**i.** For the time period November 1, 2020 to February 1, 2021, Google Map location saved and/or frequent locations, favorite and/or starred locations including, but not limited to, searches conducted using the Google Map and/or Maze services, locations and other data associated with the use of My Maps and Location Sharing, and the logs and metadata associated with all of the above;

**j.** For the period November 1, 2020 to February 1, 2021, all incoming and outgoing phone calls, voice-mails, and all instant messages associated with the Account(s) including stored or preserved copies of instant messages (including SMS messages and MMS messages) sent to and from the Account(s) (including all draft and deleted messages), the source and destination account or phone number associated with each instant message, the date and time at which each instant message was sent, the size and length of each instant message, the actual IP addresses of the sender and the recipient of each instant message, and the media, if any, attached to each instant message;

**k.** For the period November 1, 2020 to February 1, 2021, all activity relating to chats, such as **Google Hangouts**, including, but not limited to: all communications, including audio, video, text message and/or chat communications, and all data associated therewith;

**l.** For the period November 1, 2020 to February 1, 2021, the contents of all **e-mails** associated with the Account(s), including stored or preserved copies of e-mails sent to and from the account (including all draft e-mails and deleted e-mails), the source and destination addresses associated with each e-mail, the date and time at which each e-mail was sent, the size and length of each e-mail, and the true and accurate header information including the actual IP addresses of the sender and the recipient of the e-mails, and all attachments;

**m.** For the period November 1, 2020 to February 1, 2021, the contents of all files and other records stored on **Google Drive**, including, but not limited to: all device backups, all Google or third-party app data, and all files and other records, address books, contact and buddy lists, notes, reminders, calendar entries, images, videos, voice-mails, device settings, and bookmarks;

**n.** For the period November 1, 2020 to February 1, 2021, all records and other information concerning any apps or files downloaded, installed, uninstalled, or modified from the **Google Play Store**;

**o.** For the period November 1, 2020 to February 1, 2021, all files, posts, comments, and replies uploaded to YouTube by the account;

**p.** For the period November 1, 2020 to February 1, 2021, all information for the **Google Plus** profile associated with the Account(s), including all status updates, tag-lines, profile photos, background photos, cover photos and other information regarding the user of the profile, comments, items shared by or with the profile, links to videos, photographs, articles, and other items, contact or "circle" lists created by the profile, contact or "circle" lists or other groups and networks of which the profile is a member, profiles or other items "followed" by the user of the profile, Google Plus users that "followed" the profile, and information about access and use of Google Plus;

**q.** For the period November 1, 2020 to February 1, 2021, all call detail records, connection records, SMS, MMS, voice-mail messages sent by or from the **Google Voice** or **Allo** account associated with the Account(s);

**r.** For the period November 1, 2020 to February 1, 2021, all **Web** activity, including records of Internet browsing history from mobile searches, desktop browser searches, and searches of the Android device;

**s.** For the period November 1, 2020 to February 1, 2021, recent application usage associated with the Account(s) or its users (such as information collected through tracking cookies)

**t.** For the period November 1, 2020 to February 1, 2021, all activity relating to **Google Photos**, including, but not limited to: all images, graphic files, video files, and other media files stored in the Account(s), and/or were uploaded to or downloaded from any other Google service, and all data associated therewith, including the metadata for each file;

**u.** For the period November 1, 2020 to February 1, 2021, all records pertaining to communications between PROVIDER and any person regarding the Account(s), including contacts with support services and records of actions taken.

**v.** The Provider shall deliver the information set forth above via Google's electronic portal.

The Provider is hereby ordered to disclose the above information to the government within **10 days** of service of this warrant.

II.      **Information to be seized by the government**

All information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of violations of 18 U.S.C. § 1512(c)(2) (obstruction of Congress); 111 (assaulting a federal agent); 231 (civil disorders), 371 (conspiracy); 372 (conspiracy to impede or injure officer); 1361 (destruction of government property); 2101 (interstate travel to participate in riot); 1752(a)(1) and (2) (unlawful entry on restricted buildings or grounds); and 40 U.S.C. § 5104(e)(2) (violent entry, disorderly conduct, and other offenses on capitol grounds), those violations involving ERIK RAU and/or others present at the Capitol on January 6, 2021, as described in the affidavit submitted in support of this Warrant, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

(a) Information that constitutes evidence of the identification or location of the user(s) of the Account;

(b) Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the Account about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

(c) Information that constitutes evidence indicating the Account user's state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

(d) Information that constitutes evidence concerning how and when the Account was accessed or used, to determine the geographic and chronological context of account

access, use, and events relating to the crime under investigation and to the Account user;

(e) Information that constitutes evidence concerning

    a. Evidence concerning planning to unlawfully enter the U.S. Capitol, including any maps or diagrams of the building or its internal offices;

    b. Evidence concerning unlawful entry into the U.S. Capitol, including any property of the U.S. Capitol;

    c. Evidence concerning awareness of the official proceeding that was to take place at Congress on January 6, 2021, i.e., the certification process of the 2020 Presidential Election;

    d. Evidence concerning efforts to disrupt the official proceeding that was to take place at Congress on January 6, 2021, i.e., the certification process of the 2020 Presidential Election;

    e. Evidence relating to a conspiracy to illegally enter and/or occupy the U.S. Capitol Building on or about January 6, 2021;

    f. Evidence concerning the breach and unlawful entry of the United States Capitol, and any conspiracy or plan to do so, on January 6, 2021;

    g. Evidence concerning the riot and/or civil disorder at the United States Capitol on January 6, 2021;

    h. Evidence concerning the assaults of federal officers/agents and efforts to impede such federal officers/agents in the performance of their duties the United States Capitol on January 6, 2021;

i.   Evidence concerning damage to, or theft of, property at the United States Capitol on January 6, 2021;

j.   Evidence of any conspiracy, planning, or preparation to commit those offenses;

k.   Evidence concerning efforts after the fact to conceal evidence of those offenses, or to flee prosecution for the same;

l.   Evidence concerning materials, devices, or tools that were used to unlawfully enter the U.S. Capitol by deceit or by force, including weapons and elements used to breach the building or to counter efforts by law-enforcement, such as pepper spray or smoke grenades;

m.   Evidence of communication devices, including closed circuit radios or walkie-talkies, that could have been used by co-conspirators to communicate during the unlawful entry into the U.S. Capitol;

n.   Evidence of the state of mind of the subject and/or other co-conspirators, e.g., intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the criminal activity under investigation; and

o.   Evidence concerning the identity of persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the unlawful actors about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts.

(f)  For any digital device which is capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities as described in the search warrant affidavit and above, hereinafter the "Device(s)":

    a.  evidence of who used, owned, or controlled the Device(s) at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

    b.  evidence of software, or the lack thereof, that would allow others to control the Device(s), such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c.  evidence of the attachment to the Device(s) of other storage devices or similar containers for electronic evidence;

    d.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device(s);

    e.  evidence of the times the Device(s) was used;

    f.  passwords, encryption keys, and other access devices that may be necessary to access the Device(s);

    g.  documentation and manuals that may be necessary to access the Device(s) or to conduct a forensic examination of the Device(s);

    h.  records of or information about Internet Protocol addresses used by the Device(s);

i.  records of or information about the Device(s)'s Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

### III.     Government procedures for warrant execution

The United States government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope of the information to be seized specified in Section II.  That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section II and will not further review the information absent an order of the Court.  Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH ONE ACCOUNT(S) STORED AT PREMISES CONTROLLED BY GOOGLE LLC PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF VIOLATION OF 1752(a)(1) and (2); and 18 U.S.C. § 1512(c)(2)** | **SC No. 21-SC-996** <br><br> **Filed Under Seal** |

*Reference:      USAO Ref. # 2021R01009; Subject Account(s):* **erkfdzdrums@gmail.com**

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, DEREK RICHARD CORRAL, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for information which is associated with the Google account identified by the e-mail address erkfdzdrums@gmail ("TARGET ACCOUNT") which is stored at premises controlled by GOOGLE LLC ("PROVIDER"), an electronic communications services provider and/or remote computing services provider which is headquartered at / which accepts service at 1600 Amphitheatre Parkway, Mountain View, California and which maintains offices in the District of Columbia at 25 Massachusetts Avenue, NW, Washington, DC 20001.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require PROVIDER to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon

receipt of the information described in Section I of Attachment B, government-authorized

persons will review that information to locate the items described in Section II of Attachment B,

using the procedures described in Section III of Attachment B.

2.      I am a SPECIAL AGENT with the Federal Bureau of Investigation.  I have been

in this position since 2020.  Prior to becoming a Special Agent, I have been involved in Law

Enforcement since 2019.  While performing my duties as a Special Agent, I have participated in

various investigations and have executed search warrants, including searches and seizures of

computers, smart phones, digital media, software, and electronically stored information. I have

received both formal and informal training in the detection and investigation of various

offensives. As a federal agent, I am authorized to investigate violations of laws of the United

States, and as a law enforcement officer I am authorized to execute warrants issued under the

authority of the United States.

3.      The facts in this affidavit come from my personal observations, my training and

experience, and information obtained from other agents, witnesses, and agencies.  This affidavit

is intended to show merely that there is sufficient probable cause for the requested warrant.  It

does not set forth all of my knowledge, or the knowledge of others, about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, I

respectfully submit that there is probable cause to believe that violations of 18 U.S.C. §

1512(c)(2) (obstruction of Congress); 111 (assaulting a federal agent); 231 (civil disorders), 371

(conspiracy); 372 (conspiracy to impede or injure officer); 641 (theft of government property);

1361 (destruction of government property); 2101 (interstate travel to participate in riot);

1752(a)(1) and (2) (unlawful entry on restricted buildings or grounds); and 40 U.S.C. §

5104(e)(2) (violent entry, disorderly conduct, and other offenses on capitol grounds) (the "Target

Offenses") have been committed by ERIK ALLEN RAU ("the Subject") and other identified and unidentified persons, including others who may have been aided and abetted by, or conspiring with, the Subject, as well as others observed by the Subject. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, and/or fruits of these crimes further described in Attachment B.

## JURISDICTION

5.      This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, DC. *See* 18 U.S.C. § 3237.

## PROBABLE CAUSE

### *Background – The U.S. Capitol on January 6, 2021*

6.      The United States Capitol Police ("USCP"), the FBI, and assisting law enforcement agencies are investigating a riot and related offenses that occurred at the United States Capitol Building, located at 1 First Street, NW, Washington, D.C., 20510 at latitude 38.88997 and longitude -77.00906 on January 6, 2021.

7.      At the U.S. Capitol, the building itself has 540 rooms covering 175,170 square feet of ground, roughly four acres. The building is 751 feet long (roughly 228 meters) from north to south and 350 feet wide (106 meters) at its widest point. The U.S. Capitol Visitor Center is 580,000 square feet and is located underground on the east side of the Capitol. On the west side of the Capitol building is the West Front, which includes the inaugural stage

scaffolding, a variety of open concrete spaces, a fountain surrounded by a walkway, two broad

staircases, and multiple terraces at each floor.  On the East Front are three staircases, porticos on

both the House and Senate side, and two large skylights into the Visitor's Center surrounded by a

concrete parkway.  All of this area was barricaded and off limits to the public on January 6,

2021.

8.       The U.S. Capitol is secured 24 hours a day by USCP.  Restrictions around the

U.S. Capitol include permanent and temporary security barriers and posts manned by USCP.

Only authorized people with appropriate identification are allowed access inside the U.S.

Capitol.

9.       On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members

of the public.

10.       On January 6, 2021, a joint session of the United States Congress convened at the

U.S. Capitol.  During the joint session, elected members of the United States House of

Representatives and the United States Senate were meeting in separate chambers of the U.S.

Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which

took place on November 3, 2020 ("Certification").  The joint session began at approximately

1:00 p.m. Eastern Standard Time (EST).  Shortly thereafter, by approximately 1:30 p.m., the

House and Senate adjourned to separate chambers to resolve a particular objection.  Vice

President Mike Pence was present and presiding, first in the joint session, and then in the Senate

chamber.

11.       As the proceedings continued in both the House and the Senate, and with Vice

President Mike Pence present and presiding over the Senate, a large crowd gathered outside the

U.S. Capitol.  As noted above, temporary and permanent barricades were in place around the

exterior of the U.S. Capitol building, and USCP were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

12. At around 1:00 p.m. EST, known and unknown individuals broke through the police lines, toppled the outside barricades protecting the U.S. Capitol, and pushed past USCP and supporting law enforcement officers there to protect the U.S. Capitol.

13. At around 1:30 p.m. EST, USCP ordered Congressional staff to evacuate the House Cannon Office Building and the Library of Congress James Madison Memorial Building in part because of a suspicious package found nearby. Pipe bombs were later found near both the Democratic National Committee and Republican National Committee headquarters.

14. Media reporting showed a group of individuals outside of the Capitol chanting, "Hang Mike Pence." I know from this investigation that some individuals believed that Vice President Pence possessed the ability to prevent the certification of the presidential election and that his failure to do so made him a traitor.

15. At approximately 2:00 p.m., some people in the crowd forced their way through, up, and over the barricades and law enforcement. The crowd advanced to the exterior façade of the building. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials. At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of law enforcement attempted to maintain order and keep the crowd from entering the Capitol.

16. Shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as

others in the crowd encouraged and assisted those acts.  Publicly available video footage shows

an unknown individual saying to a crowd outside the Capitol building, "We're gonna fucking

take this," which your affiant believes was a reference to "taking" the U.S. Capitol.



17.     Shortly thereafter, at approximately 2:20 p.m. members of the United States

House of Representatives and United States Senate, including the President of the Senate, Vice

President Mike Pence, were instructed to—and did—evacuate the chambers.  That is, at or about

this time, USCP ordered all nearby staff, Senators, and reporters into the Senate chamber and

locked it down.  USCP ordered a similar lockdown in the House chamber.  As the subjects

attempted to break into the House chamber, by breaking the windows on the chamber door, law

enforcement were forced to draw their weapons to protect the victims sheltering inside.

18.     At approximately 2:30 p.m. EST, known and unknown subjects broke windows

and pushed past USCP and supporting law enforcement officers forcing their way into the U.S.

Capitol on both the west side and the east side of the building.  Once inside, the subjects broke

windows and doors, destroyed property, stole property, and assaulted federal police officers.

Many of the federal police officers were injured, several were admitted to the hospital, and at

least one federal police officer died as a result of the injuries he sustained.  .  The subjects also

confronted and terrorized members of Congress, Congressional staff, and the media.  The

subjects carried weapons including tire irons, sledgehammers, bear spray, and Tasers.  They also

took police equipment from overrun police including shields and police batons.  At least one of

the subjects carried a handgun with an extended magazine.  These actions by the unknown

individuals resulted in the disruption and ultimate delay of the vote Certification.

19.    Also at approximately 2:30 p.m. EST, USCP ordered the evacuation of

lawmakers, Vice President Mike Pence, and president pro tempore of the Senate, Charles

Grassley, for their safety.

20.    At around 2:45 p.m. EST, subjects broke into the office of House Speaker Nancy

Pelosi.

21.    At around 2:47 p.m., subjects broke into the United States Senate Chamber.

Publicly available video shows an individual asking, "Where are they?" as they opened up the

door to the Senate Chamber.  Based upon the context, law enforcement believes that the word

"they" is in reference to members of Congress.



22.     After subjects forced entry into the Senate Chamber, publicly available video shows that an individual asked, "Where the fuck is Nancy?"  Based upon other comments and the context, law enforcement believes that the "Nancy" being referenced was the Speaker of the House of Representatives, Nancy Pelosi.



23.     An unknown subject left a note on the podium on the floor of the Senate Chamber.  This note, captured by the filming reporter, stated "A Matter of Time Justice is Coming."



24.     During the time when the subjects were inside the Capitol building, multiple subjects were observed inside the US Capitol wearing what appears to be, based upon my training and experience, tactical vests and carrying flex cuffs.  Based upon my knowledge, training, and experience, I know that flex cuffs are a manner of restraint that are designed to be carried in situations where a large number of individuals were expected to be taken into custody.





25.     At around 2:48 p.m. EST, DC Mayor Muriel Bowser announced a citywide

curfew beginning at 6:00 p.m.

26.     At around 2:45 p.m. EST, one subject was shot and killed while attempting to break into the House chamber through the broken windows.

27.     At about 3:25 p.m. EST, law enforcement officers cleared the Senate floor.

28.     Between 3:25 and around 6:30 p.m. EST, law enforcement was able to clear the U.S. Capitol of all of the subjects.

29.     Based on these events, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. the same day.  In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured.  The proceedings resumed at approximately 8:00 pm after the building had been secured.  Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

30.     Beginning around 8:00 p.m., the Senate resumed work on the Certification.

31.     Beginning around 9:00 p.m., the House resumed work on the Certification.

32.     Both chambers of Congress met and worked on the Certification within the Capitol building until approximately 3 a.m. on January 7, 2021.

33.     During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

34.     Based on my training and experience, I know that it is common for individuals to carry and use their cell phones during large gatherings, such as the gathering that occurred in the area of the U.S. Capitol on January 6, 2021.  Such phones are typically carried at such gatherings to allow individuals to capture photographs and video footage of the gatherings, to communicate with other individuals about the gatherings, to coordinate with other participants at the gatherings, and to post on social media and digital forums about the gatherings.

35.     Many subjects seen on news footage in the area of the U.S. Capitol are using a cell phone in some capacity.  It appears some subjects were recording the events occurring in and around the U.S. Capitol and others appear to be taking photos, to include photos and video of themselves after breaking into the U.S. Capitol itself, including photos of themselves damaging and stealing property.  As reported in the news media, others inside and immediately outside the U.S. Capitol live-streamed their activities, including those described above as well as statements about these activities.

36.     Photos below, available on various publicly available news, social media, and other media show some of the subjects within the U.S. Capitol during the riot.  In several of these photos, the individuals who broke into the U.S. Capitol can be seen holding and using cell phones, including to take pictures and/or videos:





[1] https://losangeles.cbslocal.com/2021/01/06/congresswoman-capitol-building-takeover-an-attempted-coup/

[2] https://www.businessinsider.com/republicans-objecting-to-electoral-votes-in-congress-live-updates-2021-1.



*Facts Specific to This Application*

37.     On February 23, 2021, DEREK JANCART was arrested for violations of federal laws to include violations of 18 U.S.C. Section 1752 and 40 U.S.C. Section 5104 issued out of the District of Columbia. JANCART was interviewed at the time of his arrest.  During JANCART's interview, he admitted to entering the U.S. Capital on January 6, 2021 and said he was accompanied by ERIK RAU. JANCART was shown the following photographs and positively identified the person circled in red as Erik RAU.   JANCART also provided Erik RAU's telephone number, XXX-XX-XXXX.

---

[3]https://www.thv11.com/article/news/arkansas-man-storms-capitol-pelosi/91-41abde60-a390-4a9e-b5f3-d80b0b96141e



Photo 1



Photo 2



Photo 3



Photo 4



Photo 5

38.     On February 23, 2021, your affiant received a phone call from Deputy United States Marshal (DUSM) Brian Baptist, who advised that RAU had called the United States Marshal's Service in Columbus, Ohio. RAU advised that his friend (JANCART) was arrested on February 23, 2021 for being in the U.S. Capital on January 6, 2021. RAU advised that he was also in the Capitol with Jancart and would like to speak with someone about turning himself in. RAU provided his telephone number:  XXX-XXX-XXXX.

39.     According to records obtained through a search warrant served on Google, a mobile device associated with email address erkfdzdrums@gmail, which is associated with recovery phone number XXX-XXX-XXXX, was present at the U.S. Capitol on January 6, 2021. Google estimates device location using sources including GPS data and information about nearby Wi-Fi access points and Bluetooth beacons.  This location data varies in its accuracy, depending on the source(s) of the data.  As a result, Google assigns a "maps display radius" for each location data point.  Thus, where Google estimates that its location data is accurate to within 10 meters, Google assigns a "maps display radius" of 10 meters to the location data point.

Finally, Google reports that its "maps display radius" reflects the actual location of the covered device approximately 68% of the time.  In this case, Google location data shows that a device associated with erkfdzdrums@gmail was within the U.S. Capitol from 2:15 PM to 2:54 PM. Google records show that the "maps display radius" for this location data was less than or equal to 100 feet, which encompasses an area that is entirely within the U.S. Capitol Building.

40.     On February 26, 2021 RAU voluntarily provided his cellular telephone to the FBI and provided consent for the FBI to search it.  The telephone provided is a Samsung G975U, IMEI 352695100954313. A preliminary review of the cellular telephone revealed that the cellular telephone number associated with the device ends with XXX-XXX-XXXX.

41.     On February 24, 2021 PROVIDER was served with a preservation letter under 18 U.S.C. § 2703(f) related to the TARGET ACCOUNT.

42.     Based on my training and experience, I know that crimes carried out by more than one person often involve some amount of communication among those involved. This may involve working out details of and preparing to carry out a premeditated crime, working together to cover up the crime afterwards, or simply arranging to meet up someplace where an unplanned crime would later occur. Either way, I know from training and experience that emails may be used by a participant in such criminal activity often contains evidence of communication among accomplices. For instance, communication logs indicate who the PROVIDER user was communicating with both immediately before and after the crime. Similarly, your affiant has seen multiple examples of suspects communicating after a crime via text (or other online chat functions) to discuss where incriminating items have been hidden, where and what the police are doing to investigate the crime, and whether any witnesses have implicated them. This case involves many different people, including RAU, working together to breach the Capitol and

attack the officers defending the Capitol on January 6, 2020. For instance, thus far multiple individuals have been identified as having participated in the attacks on the officers by the Lower West Terrace door of the Capitol. By its very nature, such concerted actions amongst multiple people in varying locations involves discussion and planning which is regularly done by online chats or texts. Indeed, law enforcement has already identified multiple social media postings in other cases regarding plans for activity at the Capitol on January 6, 2021.

43.     Based on my training and experience, I know that victims, witnesses, and perpetrators of crimes in Washington, D.C., often communicate between and among themselves before, during, and after the crime. They communicate using text messaging, apps, social media, and calls via both typical phone calls and App-enabled calling and emailing methods, such as those available through PROVIDER. In my training and experience, communications between suspects have revealed the identities and relationships between and among the involved individuals, as well as their motive, hostility, knowledge, and intent relating to the crime. Moreover, such communications have also revealed consciousness of guilt and efforts to impede police investigation, such as threats sent to witnesses or victims after a crime. Similarly, they are often featured in photographs and/or video recordings together, which provide key evidence in demonstrating the nature of their relationship. In addition, an examination of the social media account's contact list (which takes the form of lists of users the account is following, that are following the account, or that are blocked by the account) is often critical in establishing these relationships, as people who know each other typically have each other's information in their contact lists, and, outside celebrity accounts, people are unlikely to have complete strangers included in such lists. As such, evidence of the Account User's intent and state of mind is likely

to be found in discussions between the Account User and unidentified co-conspirators, along with evidence about the identity of such co-conspirators.

44.     Based on my training and experience, I know that witnesses, and even perpetrators, often record criminal activity. For example, witnesses have recorded school fights, attacks on public transportation, and police shootings and assaults. Law enforcement has seen such videos shared and discussed amongst co-conspirators or friends on sites like Instagram and Facebook. These videos have proven extremely crucial in investigations by depicting the crime itself. Similarly, law enforcement has seen criminals take photographs of their victims and of themselves with the proceeds of a crime shortly after committing it. In this case in particular, your affiant has already identified some video recordings of the RAU's involvement in the storming of the Capitol on January 6, 2021, seized from Derek Jancart's Facebook account. Your affiant believes that it is likely to find additional photographs or videos in the TARGET ACCOUNT. In addition, your affiant also knows through training and experience that, just like most people, criminals often keep photos and videos of themselves and these photos and videos can be backed up through the PROVIDER account. These photos and videos capture the clothes they own and wear at the time of the photograph, which is relevant in identifying the individual in videos and photographs from the breach of the Capitol.

45.     Based on my training and experience, I know that people who commit crimes often use their cell phones to capture and store images or video recordings of related contraband – sometimes called "trophy photos," such as photos of any items taken during the breach of the Capitol. They also often share these images or video recordings with associates using text messaging or other forms of communication on their cell phone, such as email. These photos or

videos could be backed up through RAU's google account and the communications of these photos or videos could be contained in RAU's google account.

46.    I have reviewed Capitol Police surveillance footage that appears to show RAU using his cellular phone while in the Capitol. Accordingly, there is probable cause to believe that the TARGET ACCOUNT, google account, erkfdzdrums@gmail, that was present in the Capitol on January 6, and which is associated with recovery phone number XXX-XXX-XXXX, will contain fruits, contraband, evidence and instrumentalities of the Target Offenses.

## BACKGROUND CONCERNING GOOGLE

47.    PROVIDER is the provider of the internet-based account(s) identified in Attachment A.

48.    PROVIDER is considered an electronic communications service ("ECS") and a remote computing service ("RCS") provider because it provides its users access to a variety of electronic communications and remote computing services as defined by 18 U.S.C. §§ 2510(15) and 2711(2).  PROVIDER provides a diverse array of Internet-based services designed to facilitate communication, information sharing, and cloud storage for its users.  User-based services range from e-mail (Gmail), to online collaboration platforms (such as Google Docs, Google Sheets, Google Forms, and Google Jamboard), to cloud storage (Google Drive). [4]

49.    Based on my training and experience, I know that PROVIDER allows users to obtain accounts by registering with PROVIDER.  During the registration process, PROVIDER asks users to create a username and password, and to provide basic personal information, such as a name, an alternate e-mail address for backup purposes, a phone number, and in some cases, a

---

[4] At times, social media providers such as PROVIDER can and do change the details and functionality of the services they offer.  While the information in this section is true and accurate to the best of my knowledge and belief, I have not specifically reviewed every detail of PROVIDER's services in connection with submitting this application for a search warrant.  Instead, I rely upon my training and experience, and the training and experience of others, to set forth the foregoing description for the Court.

means of payment.  PROVIDER typically does not verify user names.  However, PROVIDER does verify the e-mail address or phone number provided.

50.     Among its services, PROVIDER provides e-mail services through Gmail, which includes folders, such as an "inbox" and a "sent mail" folder, as well as electronic address books or contact lists, and all of those folders are linked to the user's username.  Moreover, a user's PROVIDER e-mail account can be used not only for e-mail but also for other types of electronic communication, including instant messaging and photo and video sharing; voice calls, video chats, SMS text messaging; document creation, sharing and storage; and social networking. Depending on user settings, user-generated content derived from many of these services is normally stored on PROVIDER's servers until deleted by the user.  Such user-generated content can remain on PROVIDER's servers indefinitely if not deleted by the user, and even after being deleted, it may continue to be available on PROVIDER's servers for a certain period of time. Furthermore, a user can store contacts, calendar data, images, videos, notes, documents, bookmarks, web searches, browsing history, and various other types of information on PROVIDER's servers.  Based on my training and experience, I understand that evidence of who controlled, used, and/or created a PROVIDER account may be found within such computer files and other information created or stored by the PROVIDER user.  Based on my training and experience, I know that the types of data discussed above can include records and communications that constitute evidence of criminal activity.

51.     PROVIDER also offers access to the website YouTube.  YouTube is a video-sharing website that allows people to discover, watch and share videos. It also acts as a distribution platform for original content creators and advertisers large and small.  Users who

have a YouTube account can also comment and communicate on the platform with other YouTube users.

52.    PROVIDER also offers users access to a free voice-over-internet-protocol (VOIP) communications system called Google Voice.  Users are provided with a phone number they select from a pool of available numbers.  These numbers can be from whatever area code and prefix they desire and have no correlation with the user's actual location when the number is selected.  Users can make and receive phone calls and text messages through the Google Voice platform on their device or through a browser.  PROVIDER maintains call detail records similar to those of a traditional cellular or wire line telephone company.  Additionally, they also store the text message content of sent and received text messages, as well as any saved voice mails and the associated transcript.

53.    When a user links their Android device to their PROVIDER account, they have the option to transfer all the names, addresses, phone numbers, e-mail addresses, notes, and pictures associated with the account to the phone and vice-versa.  When connected to the internet, Google Services will then sync any future changes across devices associated with the account which have opted in to this service.  This information can assist with identifying previously unknown co-conspirators or witnesses.

54.    Based on my training and experience, I understand that PROVIDER maintains records that can link different PROVIDER accounts to one another, by virtue of common identifiers, such as common e-mail addresses, common telephone numbers, common device identifiers, common computer cookies, and common names or addresses, that can show a single person, or single group of persons, used multiple PROVIDER accounts.  Based on my training and experience, I also know that evidence concerning the identity of such linked accounts can be

useful evidence in identifying the person or persons who have used a particular PROVIDER account.

55.     A user also has the option to store, upload, and share digital images, graphic files, video files, and other media files on servers maintained or owned by PROVIDER.  These images may be downloaded from the Internet, sent from other users, or uploaded from the user's mobile device.  In many cases, an Android user may configure their device to automatically upload pictures taken with a mobile device to their PROVIDER account.  Based on my training and experience, I know that these files may provide evidence of incriminating acts, identify co-conspirators or witnesses, and assist investigators with determining geographic locations such as residences, businesses, and other places relevant to the investigation.

56.     Additionally, PROVIDER provides the Android mobile operating system used on mobile electronic devices, such as smartphones and tablets.  Mobile devices running on the Android operating system frequently come with a suite of PROVIDER applications ("apps")—such as Gmail, Chrome, and Google Maps—preinstalled on the device and accessible using a PROVIDER account.  When a user purchases and activates a mobile device running the Android operating system, one of the initial prompts during the set up phase is to associate a Gmail account with the device.  If the consumer does not have an existing Gmail account, the operating system prompts the user to create a new account.  Whether the Gmail account is new or existing, the association of the account with the device allows PROVIDER to collect and store information regarding the use of the device which can be relevant to the criminal investigation. Some Android services may also be registered with an e-mail account not hosted by PROVIDER.

57.     Mobile devices running on PROVIDER'S Android mobile operating system come pre-installed with PROVIDER'S Google Play Store app, which allows the device user to download other PROVIDER and third-party apps to the device, either free or at cost.  Google Play Store also functions as a digital media store, allowing Android users to purchase music, books movies, and television programs.  In my training and experience, the identification of apps downloaded from Google Play Store may reveal services used to communicate with accomplices and co-conspirators and services used in furtherance of the criminal activity.

58.     PROVIDER also offers its own web browser, a program called Google Chrome, which can be used instead of other web browsers such as Microsoft Internet Explorer or Mozilla Firefox.  Users who have a Google account can use Google Chrome on multiple devices, and can decide which information "syncs" or synchronizes across multiple devices that are running Google Chrome.  Devices that can be synced include computers, Google's own computers called Chromebooks, devices running Google's own Android operating system, or iPhones or iPads (devices made by Apple, Inc. that use Apple's proprietary operating system).  Users have the option to sync all data across multiple devices, or only certain information by checking certain boxes, and can choose to require a passphrase to sync between different computers as well as to encrypt any passwords stored by Google Chrome.   Furthermore, a user's history that relates to web browsing, web searches, and certain activity related to Google services or applications (or "apps") are stored in an account's Google History, or Google Web & App Activity.

59.     PROVIDER offers a range of additional services to its users which can be accessed from an Android device via mobile apps or the Google Chrome web browser.  These include:

a. **Google Plus**, a social networking platform on which Google users can create a publicly visible profile that displays status updates posted by the user and certain other user-populated information, including a "tagline" describing the user, a profile photo, background photo, cover photo, and other details about the user, including the user's birthday, previous work and school history, interests, and places lived.  Google Plus users are able to communicate with, "follow" the profiles and activities of, comment on posts made by, and share information posted by, other Google Plus users.  A Google Plus user also can elect to display on his or her Google Plus profile links to (a) the user's other social networking profiles or accounts (including those that are non-PROVIDER-based), (b) websites for which the user is a contributing author, and (c) links to any other websites that are recommended by the use;

b. **Google Hangouts** ("Hangouts"), an instant messaging service which allows users to communicate by text, voice, and video.  A Hangouts user can, among other things, participate in group conversations, share photos, maps, and other media with other users of Hangouts, and place calls to landline, mobile, and internet-based telephone numbers;

c. **Google Photos** ("Photos"), a digital photograph and video storage service where a user can upload photos and videos from any platform to servers controlled by PROVIDER, categorize these photos and videos into albums, and share them with other users;

d. **Google Maps**, a geolocation service through which users can find and share turn-by-turn directions between two points, save locations, and search geographic

areas, including their current vicinity.  Users can share their real-time location

with others through Maps by using the Location Sharing feature.  PROVIDER

retains a record of the use of this service whenever the user is logged into their

account and has opted into location services and history settings.  PROVIDER

account holders can also create, save, and share personalized maps using Google

My Maps;

e. **Google Location Services and Location History**, device settings by which users

authorize PROVIDER to access and retain a record of their device's approximate

location at regular intervals using GPS, WiFi, mobile networks, sensors, and other

sources.  This location data is then supplied to any apps (whether PROVIDER-

based or otherwise) operating on the devices that have been authorized by the user

to access the user's location information;

f. **Google Docs**, **Google Sheets**, **Google Slides**, **Google Forms**, and **Google

Jamboard**, services provided by PROVIDER that offer users web-based

alternatives to existing word processing, spreadsheet, and presentation software.

Documents created using these platforms are stored in servers controlled by

PROVIDER and accessible from any device using web browsers and mobile apps

logged into the user's account.  The creator of the document can enable access

and editing to the document by any other user to allow for collaboration and

communication in the document development.  This information, based on my

training and experience, can include pay-owe sheets, recordation of sales, as well

as communications with unknown co-conspirators and or witnesses;

60.     PROVIDER also provides cloud storage through **Google Drive**, which includes an initial fifteen gigabytes of free storage space and the ability for users to purchase additional space if needed.  That storage space, located on servers controlled by PROVIDER, may contain data associated with the use of Drive-connected devices, including the services and applications described above.   Drive can be used to store Android device backups, which can contain a user's photos and videos, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voice-mail messages, call history, contacts, calendar events, reminders, notes, app data and settings, and other data.  Android-device users can also configure many third-party apps (such as WhatsApp, Snapchat, and Twitter) to automatically back-up the app data to Google Drive.  Data stored on Google Drive can be accessed by the user from any device using mobile apps and web browsers logged into the user's account, allowing users to easily regain information if their device is lost, stolen, or damaged.

61.     Based on my training and experience, I know that providers such as PROVIDER also collect and maintain information about their users, including information about their use of PROVIDER services.  This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account.  Providers such as PROVIDER also commonly have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with other logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which devices were used to access the relevant account.

62.     PROVIDER also collects and retains location data from Android-enabled mobile devices that have opted into the Location Services and Location History services.  The company uses this information for location-based services, such as targeted advertising and Google Maps guidance.  This information derives from a range of sources, including Global Positioning System (GPS) data, cell site/cell tower information, and Wi-Fi access points.  User preferences may impact the extent and detail of the location information collected.  Other information may be collected by PROVIDER that provides inferences about a user's location.  For example, WiFi access points may have descriptive names or be associated with locations in publicly accessible geolocation databases.  IP addresses may also be associated with locations through similar services.  Advertising records may contain specific or inferred location information.  Metadata associated with image and video files stored by PROVIDER on behalf of a user may include information about where the images or videos were taken (EXIF data, for example).  In my training and experience, this data can show the movement of the suspect's mobile device and assist investigators with establishing patterns of movement and identifying residences, work locations, potential drug stash houses, suppliers, customer addresses, and other areas of investigative interest.

63.     Based on my training and experience, I understand that providers such as PROVIDER also collect information relating to the devices used to access a user's account – such as laptop or desktop computers, cell phones, and tablet computers.  Such devices can be identified in various ways.  For example, some identifiers are assigned to a device by the manufacturer and relate to the specific machine or "hardware," some identifiers are assigned by a telephone carrier concerning a particular user account for cellular data or voice services, and some identifiers are actually assigned by PROVIDER in order to track what devices are using

PROVIDER's accounts and services.  Examples of these identifiers include unique application number, hardware model, operating system version, Global Unique Identifier ("GUID"), device serial number, mobile network information, telephone number, Media Access Control ("MAC") address, and International Mobile Equipment Identity ("IMEI").  Based on my training and experience, I know that such identifiers may constitute evidence of the crimes under investigation because they can be used (a) to find other PROVIDER accounts created or accessed by the same device and likely belonging to the same user, (b) to find other types of accounts linked to the same device and user, and (c) to determine whether a particular device recovered during the course of the investigation was used to access the PROVIDER account.

64.     PROVIDER also allows its users to access its various services through an application that can be installed on and accessed via cellular telephones and other mobile devices.  This application is associated with the user's PROVIDER account.  In my training and experience, I have learned that when the user of a mobile application installs and launches the application on a device (such as a cellular telephone), the application directs the device in question to obtain a Push Token, a unique identifier that allows the provider associated with the application (such as PROVIDER) to locate the device on which the application is installed.  After the applicable push notification service (*e.g.*, Apple Push Notifications (APN) or Google Cloud Messaging) sends a Push Token to the device, the Token is then sent to the application, which in turn sends the Push Token to the application's server/provider.  Thereafter, whenever the provider needs to send notifications to the user's device, it sends both the Push Token and the payload associated with the notification (*i.e.*, the substance of what needs to be sent by the application to the device).  To ensure this process works, Push Tokens associated with a user's account are stored on the provider's server(s).  Accordingly, the computers of

PROVIDER are likely to contain useful information that may help to identify the specific device(s) used by a particular user to access the user's PROVIDER account via the mobile application.

65.     Based on my training and experience, I understand that providers such as PROVIDER use cookies and similar technologies to track users visiting PROVIDER's webpages and using its products and services.  Basically, a "cookie" is a small file containing a string of characters that a website attempts to place onto a user's computer.  When that computer visits again, the website will recognize the cookie and thereby identify the same user who visited before.  This sort of technology can be used to track users across multiple websites and online services belonging to PROVIDER.  More sophisticated cookie technology can be used to identify users across devices and web browsers.  From training and experience, I know that cookies and similar technology used by providers such as PROVIDER may constitute evidence of the criminal activity under investigation.  By linking various accounts, devices, and online activity to the same user or users, cookies and linked information can help identify who was using a PROVIDER account and determine the scope of criminal activity.

66.     Based on my training and experience, I understand that users can communicate directly with PROVIDER about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Providers such as PROVIDER typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

67.     In summary, based on my training and experience in this context, I believe that
the computers of PROVIDER are likely to contain user-generated content such as stored
electronic communications (including retrieved and unretrieved e-mail for PROVIDER
subscribers), as well as PROVIDER-generated information about its subscribers and their use of
PROVIDER services and other online services.  In my training and experience, all of that
information may constitute evidence of the crimes under investigation because the information
can be used to identify the account's user or users.  In fact, even if subscribers provide
PROVIDER with false information about their identities, that false information often
nevertheless provides clues to their identities, locations, or illicit activities.

68.     As explained above, information stored in connection with a PROVIDER account
may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal
conduct under investigation, thus enabling the United States to establish and prove each element
of the offense, or, alternatively, to exclude the innocent from further suspicion.  From my
training and experience, I know that the information stored in connection with a PROVIDER
account can indicate who has used or controlled the account.  This "user attribution" evidence is
analogous to the search for "indicia of occupancy" while executing a search warrant at a
residence.  For example, e-mail communications, contacts lists, and images sent (and the data
associated with the foregoing, such as date and time) may indicate who used or controlled the
account at a relevant time.  Further, information maintained by PROVIDER can show how and
when the account was accessed or used.  For example, providers such as PROVIDER typically
log the IP addresses from which users access the account along with the time and date.  By
determining the physical location associated with the logged IP addresses, investigators can
understand the chronological and geographic context of the PROVIDER account access and use

relating to the criminal activity under investigation.  This geographic and timeline information may tend to either inculpate or exculpate the person who controlled, used, and/or created the account.  Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via e-mail).  Finally, stored electronic data may provide relevant insight into the user's state of mind as it relates to the offense under investigation.  For example, information in the PROVIDER account may indicate its user's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).[5]

69.     Based on my training and experience, I know that evidence of who controlled, used, and/or created a PROVIDER account may be found within the user-generated content created or stored by the PROVIDER subscriber.  This type of evidence includes, for example, personal correspondence, personal photographs, purchase receipts, contact information, travel itineraries, and other content that can be uniquely connected to a specific, identifiable person or group.  In addition, based on my training and experience, I know that this type of user-generated content can provide crucial identification evidence, whether or not it was generated close in time to the offenses under investigation.  This is true for at least two reasons.  First, people that commit crimes involving electronic accounts (*e.g.*, e-mail accounts) typically try to hide their identities, and many people are more disciplined in that regard right before (and right after)

---

[5] At times, internet services providers such as PROVIDER can and do change the details and functionality of the services they offer.  While the information in this section is true and accurate to the best of my knowledge and belief, I have not specifically reviewed every detail of PROVIDER's services in connection with submitting this application for a search warrant.  Instead, I rely upon my training and experience, and the training and experience of others, to set forth the foregoing description for the Court.

committing a particular crime.  Second, earlier-generated content may be quite valuable, because criminals typically improve their tradecraft over time.  That is to say, criminals typically learn how to better separate their personal activity from their criminal activity, and they typically become more disciplined about maintaining that separation, as they become more experienced. Finally, because e-mail accounts and similar PROVIDER accounts do not typically change hands on a frequent basis, identification evidence from one period can still be relevant to establishing the identity of the account user during a different, and even far removed, period of time.

## REQUEST TO SUBMIT WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

70.    I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant. I submit that Assistant U.S. Attorney Leslie A. Goemaat, an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

## CONCLUSION

71.    Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on PROVIDER, who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.  Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

_____
Derek Richard Corral
Special Agent
Federal Bureau of Investigation

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on March 24, 2021.

_____

ZIA M. FARUQUI
UNITED STATES MAGISTRATE JUDGE

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by _____ ("PROVIDER"), and my title is _____.
I am a custodian of records for PROVIDER, and I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of PROVIDER.  The attached records consist of:

_____

[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]

I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of PROVIDER, and they were made by PROVIDER as a regular practice; and

b.      such records were generated by PROVIDER's electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of PROVIDER in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by PROVIDER, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.


_____         _____
Date                              Signature